UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LINDA BURGE, | ) | Case No. 5:09CV45 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| REPUBLIC ENGINEERED PRODUCTS, | ) | **MEMORANDUM OPINION** |
| Inc., | ) | **AND ORDER** |
| Defendant. | ) | |

The instant matter is before the Court on Plaintiff's Linda Burge's ("Plaintiff") motion for summary judgment (ECF Dkt. #25) and Defendant Republic Engineered Products, Inc.'s ("Defendant") motion for summary judgment (ECF Dkt. #24).  For the following reasons, the Court GRANTS Plaintiff's motion (ECF Dkt. #25) and DENIES Defendant's motion (ECF Dkt. #24):

## I. SYNOPSIS OF THE FACTUAL AND PROCEDURAL HISTORY

### A. Medical Evidence

Plaintiff was a Benefits Analyst for Defendant from 2002 until September, 2005.  ECF Dkt. #31 (Administrative Record, hereinafter "Tr.") at 1102.  On September 20, 2005, Plaintiff fell on a stairway in the course of her employment.  *Id*. at 1102-03.  She suffered a wrist injury from the incident.  *Id*. at 1103.  She was examined by R. William McCue of the Summit Hand Center on September 22, 2005.  Tr. at 138-39.  He diagnosed a wrist and elbow sprain and contusion, placed her in a short arm thumb spica case, and recommended that she remain off of work until October 3, 2005.  *Id*.  On that date, he released her for light duty.  *Id*.  Plaintiff did not work from October 5, 2005 through October 11, 2005.  *Id*. at 1103.  She then returned to work 4 hours per day on light duty.  *Id*.  On October 20, 2005, she had her cast removed.  *Id*. at 130.  X-rays taken on October 20, 2005 showed nondisplaced distal radius fracture without angulation or displacement, and Dr. McCue observed significant right median neuropathy in the hand and wrist, with clinically evident swelling.  *Id*. at 131.  Dr. McCue prescribed physical therapy and released Plaintiff for a 4-hour work schedule

2-3 weeks later.  *Id*.

Plaintiff continued to treat with Dr. McCue and began seeing Dr. Tribuzi through November of 2005.  Tr. at 12, 20, 23, 23, 124.   On December 1, 2005, Dr. McCue opined that Plaintiff could work 8 hours per day. *Id*. at 14.  Plaintiff continued to treat with Dr. Tribuzi and Dr. McCue, while presenting various complaints of pain and motion limitation.  *Id*. at 4, 6, 7, 11, 45.

On February 2, 2006, Plaintiff treated with Dr. Dix for difficulty with concentration and confidence.  Tr. at 731.  Dr. Dix diagnosed Severe Major Depression and prescribed medication along with weekly therapy.  *Id*. at 731-32.

On February 16, 2006, Plaintiff saw Dr. Shelby Cash of Dr. McCue's office.  Tr. at 39.  Dr. Cash performed BTE measurements and learned that Plaintiff had lost grip strength compared to initial testing.  *Id*.  Dr. Cash opined that no further medication, therapy, or medical treatment would improve Plaintiff's condition.  *Id*.  Dr. Cash opined that Plaintiff is limited to a 5 pound lifting restriction.  *Id*.

On April 28, 2006, Plaintiff presented to Dr. William Seitz on a referral from Dr. Alan Wilde. Tr. at 84, 291-92.  Dr. Seitz observed that Plaintiff had Triangular Fibrocartilage Complex tear, early arthrosis at the Distal Radioulnar Joint and carpo-metacarpal of the left wrist.  *Id*. at 291.   On June 29, 2006, Dr. Seitz suggested surgical intervention to treat Plaintiff's wrist.  *Id*. at 88.

At Defendant's request, Plaintiff was seen by Dr. Greg Martin for a psychological evaluation. Tr. at 708-16.   On July 14, 2006, Dr. Martin opined that Plaintiff did not provided a reliable self-report nor valid or reliable psychological testing.  *Id*. at 715.  He opined that she was not suffering from Major Depressive Disorder because "she provided an invalid examination that strongly calls into question her reliability."  *Id*. at 716.  He opined that Plaintiff is not totally disabled.  *Id*.  On July 24, 2006, however, Plaintiff saw Dr. Sam Rajiah on referral from Dr. Cash.  *Id*. at 640-42.  Dr. Rajiah opined that Plaintiff suffered from Major Depressive Disorder and that "[h]er depression is quite debilitating".  *Id*. at 642.  Dr. Rajiah later submitted a telediction to the Ohio Bureau of Disability Determination, opining that Plaintiff had no element of secondary gain in her request for disability, her level of anxiety was high, and she experienced periods of confusion and disorientation.  *Id*. at 649.

On August 17, 2006, Dr. Richard Reichert examined Plaintiff.  Tr. at 201.  She complained of constant pain in the distal portion of the right wrist, and a physical examination showed diffuse tenderness to palpation, tenderness overlying the ulnar styloid and the distal radius.  *Id*. at 203.  Although Plaintiff was hesitant to move her wrist or to write, she was observed after the appointment carrying her car keys in her right hand and starting her car with her right hand.  *Id*. at 203.

Dr. Seitz performed surgery on Plaintiff's wrist on January 8, 2007.  Tr. at 658.  Plaintiff continued to treat with Dr. Seitz for her wrist impairment through April of 2007.  *Id*. at 252, 254, 256, 262, 264, 266, 269, 272, 283-85, 287, 658-59.  As of April, 2007, Dr. Seitz's diagnosis remained chronic distal radioulnar joint arthritis, distal radioulnar joint diasociation, and triangular figbrocartilage complex rupture.  *Id*. at 252.  On May 10, 2007, Dr. Magoline opined that Plaintiff has not reached maximum medical improvement.  *Id*. at 377.  She was currently undergoing occupational therapy and participating in a home exercise program.  *Id*.  Dr. Magoline did not expect Plaintiff to reach maximum medical improvement until 12-16 months post-operatively.  *Id*.  Dr. Magoline opined that Plaintiff would require the following restrictions in the work-setting: minimal use of the right hand; no repetitive use of the right hand; no lifting greater than 5 lbs with the right hand.  *Id*.

## B.        Disability Claim and Federal Suit

On February 9, 2006, Plaintiff applied for medical disability salary continuation due to injuries sustained at a work related conference.  Tr. at 686.  On March 13, 2006, Plaintiff received a letter from Defendant, stating that she would receive Short Term Disability ("STD") benefits of 100% of her base salary for three months.  *Id*. at 846.  Plaintiff would then receive Long Term Disability ("LTD") of 60% of her base salary, less offsets, until she was no longer disabled or until she reached the age of 65.  *Id*.  Between July 1, 2006 and August 15, 2006, Plaintiff received LTD totaling $4,125.96. *Id*. at 1495.  On September 11, 2006, Defendant sent Plaintiff a letter notifying her that her disability benefits were being terminated based upon a psychological examination

conducted by Dr. Mark Tully on August 15, 2006.  *Id*. at 884-85.[1]  The letter states that "the Plan requires you to be totally disabled in order to receive benefits."  *Id*. at 884.

On February 12, 2007, Plaintiff appealed the September 11, 2006 decision, contending that Dr. Dix's report undermines Dr. Tully's report.  *Id*. at 886-87.  On July 19, 2007, Defendant sent a letter to Plaintiff denying her appeal.  *Id*. at 881-82.  This letter stated that the Plan defined a "disability" as a condition that prevents a participant from engaging in his or her regular occupation, for which the participant is under the regular care and personal attendance of a medical doctor or other professional practitioner for treatment aimed at maximizing such participant's recovery and return to work.  *Id*. at 881.  The letter further states that Plaintiff has completed the appeal process under the Plan.  *Id*.  Lastly, this letter asserts that because Plaintiff's disability benefits were terminated in August of 2006, she never exceeded the STD period and the LTD plan was not involved in the appeal.  *Id*. at 882.

On August 29, 2007, Plaintiff sent a letter to Defendant asserting that Defendant's July 19, 2007 letter improperly focused only on psychological issues.  Tr. at 311.  Plaintiff maintained that she was physically unable to perform her duties.  *Id*.  On September 12, 2007, Defendant sent a letter to Plaintiff stating that Plaintiff received disability benefits from September, 2005 through February, 2006 for wrist injuries and was released to work in February, 2006 with weight restrictions.  *Id*. at 237.  The letter states that "thereafter disability benefits were based on medicals which stated that she suffered from severe depression."  *Id*.  The letter went on to explain that there was "no dispute" as to Plaintiff's ability to work taking into account only her wrist, and that denial of her claim therefore focused only on psychological issues. *Id*. at 238.  The letter states that treatment records from Dr. Seitz indicating the need for wrist surgery were dated after her benefits were terminated and were therefore not relevant to the determination of whether she was disabled prior to August 15, 2006.  *Id*. at 238-39.

---

[1]     This letter is an unsigned draft, but the parties do not appear to dispute the basis for the cessation of Plaintiff's disability benefits.

On April 18, 2007, Plaintiff's claim for Social Security Disability was awarded.  Tr. at 1490. The Commissioner of the Social Security Administration determined that her onset date was January 18, 2006.  On October 9, 2007, Plaintiff sent a letter asserting that the evidence pertaining to the exacerbated wrist condition was relevant as long as it was submitted during the appeal period.  *Id*. at 309-10.

On January 8, 2009, Plaintiff filed the instant suit, alleging in Count I that Defendant has wrongfully, and/or arbitrarily and capriciously refused to pay and/or continue her LTD benefits, in violation of the LTD Plan and  29 U.S.C. § 1132(A), *et seq*.  ECF Dkt. #1.  In Count II, Plaintiff alleges that she is entitled a determination under her 401(k) Plan as to whether she is vested due to disability.  *Id*.  In Count III, Plaintiff alleges that Defendant failed to meet its obligation under ERISA to provide a final letter or decision with regard to vesting under the 401(k) plan.  *Id*.

On February 18, 2009, Defendant sent a letter to Plaintiff stating that Plaintiff's Social Security disability award did not change Defendant's determination of disability because the claims were based on different impairments.  ECF Dkt. #23, Ex. 1.  The letter further asserts that no medical evidence was submitted to indicate that Plaintiff was disabled due to her wrist between February, 2006 and August, 2006, and evidence generated after those dates is "not the same."  *Id*.

On July 31, 2009, Plaintiff and Defendant filed reciprocal summary judgment motions.  ECF Dkt. ## 24, 25.  On August 28, 2009, Defendant filed a brief in opposition to Plaintiff's motion.  ECF Dkt. #26.  On August 31, 2009, Plaintiff filed a brief in opposition to Defendant's motion.  ECF Dkt. #27.  On July 9, 2009, Plaintiff filed a reply brief.  ECF Dkt. #38.  On October 14, 2009, Defendant filed a reply brief.  ECF Dkt. #30.  On November 13, 2009, the Parties filed stipulations.  ECF Dkt. #35.  On December 11, 2009, the Court conducted a hearing on the matter.

## II.      SUMMARY JUDGMENT STANDARD OF REVIEW

The function of summary judgment is to dispose of claims without trial when one party is unable to demonstrate the existence of a factual dispute which, if present, would require resolution by a jury or other trier of fact.  *Schultz v. Newsweek, Inc.*, 668 F.2d 911, 918 (6th Cir. 1982). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(C).

The party moving for summary judgment has the burden of showing there exists no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This burden can be discharged by showing that the nonmoving party has failed to establish an essential element of her case, for which she bears the ultimate burden of proof at trial. *See e.g., Catrett v. Celotex Corp.*, 477 U.S. 317, 323 (1986); *Morales v. Am. Honda Motor Co., Inc.,* 71 F.3d 531, 535 (6th Cir. 1995). The evidence and all the inferences that can reasonably be drawn therefrom must be read in the light most favorable to the nonmoving party. *Id.*

If the moving party meets her burden, the nonmoving party must take affirmative steps to avoid the entry of a summary judgment. *See* Fed. R. Civ. P. 56(e). To refute such a showing, the nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Celotex*, 477 U.S. at 322. A mere scintilla of evidence is not enough. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

In ruling on a motion for summary judgment, the court is not obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. *Interroyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Therefore, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the record specifically called to its attention by the parties. *Staats v. United States*, No. C-3-99-174, 2001 WL 1135056, *3 (S.D. Ohio Mar. 12, 2001), unreported; *Interroyal Corp. v. Sponseller*, 889 F .2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990).

## III.     LAW AND ANALYSIS

### A.       STANDARD OF REVIEW FOR DISABILITY DETERMINATION

Plaintiff contends that Defendant's decision should be reviewed under a *de novo* standard because: (1) the STD plan, which is apparently applicable does not reserve discretion in determining disability; (2) the Plan is ambiguous and there is an absence of guidelines for filing by a claimant; and (3) a conflict of interest exists. ECF Dkt. #25 at 2-3.

Defendant contends that an arbitrary and capricious standard applies under the terms of the Comprehensive Welfare Plan, which provided in relevant part:

> The Plan Administrator will have absolute discretion to construe and interpret any and all provisions of the Plan and the Constituent Benefit Programs, including, but not limited to, the discretion to resolve ambiguities, inconsistencies, or omissions conclusively; provided however, that all such discretionary interpretations and decisions will be applied in a uniform and nondiscriminatory manner to all Participants, beneficiaries, and Covered Eligible Dependents who are similarly situated. The decisions of the Plan Administrator upon all matters within the scope of its authority will be binding and conclusive upon all persons.

ECF Dkt. #24 citing Tr. at 1912; *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948 (1989); *Yeager v. Reliance Std. Life Ins. Co.*, 88 F.3d 376,380 (6th Cir. 1996).

The standard of review of benefit determinations in ERISA cases is *de novo* unless the benefit plan gives the plan administrator discretion to construe plan terms and discretion to determine eligibility for benefits. *Firestone*, 49 U.S. at 115. If the benefit plan expressly and clearly grants discretionary authority, the court does not conduct a *de novo* review, but rather determines whether the plan administrator's decision was arbitrary and capricious. *See id.*

In the case at bar, contrary to Plaintiff's contention, the Comprehensive Welfare Plan provides Defendant with discretion to interpret all Constituent Benefit Programs, which include the STD and LTD Plans. Tr. at 1912, 1930. Accordingly, an arbitrary and capriciousness standard applies.

Plaintiff contends that the arbitrary and capricious standard is eroded to the extent necessary to clearly recognize the irrebuttable presumption of a conflict of interest. ECF Dkt. #25 at 3 citing *Schey v. UNUM Life Ins. Co.*, 145 F. Supp. 2d 919 (N.D. Ohio 2001), citing *Killian v. Healthsource Provider Admr's*, 152 F.3rd 514 (6th Cir. 1998). The Court acknowledges that in *Killian v. Healthsource Provident Administrators, Inc.,* the Sixth Circuit Court of Appeals recognized an irrebuttable presumption that an inherent conflict of interest exists when a plan administrator acts as both administrator and payor. 152 F.3d 514 (6th Cir. 1998). However, this Court does not interpret *Killian* as a modification or an erosion of the arbitrary and capricious standard. Rather, the Sixth Circuit in *Killian* was identifying a conflict of interest as a consideration that must be accounted for in determining if the plan administrator has acted arbitrarily and capriciously. It remains that the arbitrary and capricious standard is the applicable standard of review. This Court notes that the *Schey* court was confronted with the issue of whether a conflict of interest constituted a sufficient

-7-

ground for undertaking *de novo* review in lieu of review under an abuse of discretion standard. *Schey*, 145 F. Supp. 2d at 924.  In *Schey*, the claimant asserted that the standard articulated by the Ninth and Second Circuit Court of Appeals should apply, and the *Schey* court explained that:

> The solution decided upon by the *Atwood* court provides for a two-part analysis. First, the plaintiff must prove "by material, probative evidence, beyond the mere fact of apparent conflict" that the self-interest caused the administrator to  breach a fiduciary duty to the plaintiff.  If the plaintiff fails to carry that burden, then the district court applies the traditional abuse of discretion standard.  If, however, the plaintiff meets that burden, the burden then shifts to the administrator to produce evidence showing "that the conflict of interest did not affect the decision to deny benefits."  If the administrator cannot carry that burden, then de novo review applies.  In coming up with this test, the Court relied heavily on the Eleventh Circuit's decision in *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*

*Schey*, 145 F.Supp.2d at 923-24 (footnotes omitted).  The *Schey* court went on to note that **"The Court can find no indication that the Sixth Circuit has adopted the *Atwood* test**. In a relatively recent case- *University Hospitals v. Emerson Electric Co.* [202 F.3d 839, 846 (6th Cir.2000)]-the Court stated that **'possible conflict of interest inherent in this situation should be taken into account as a factor in determining whether the [EBC's] decision was arbitrary and capricious.'** " *Id*. at 924 (emphasis added).  Accordingly, this Court will review Defendant's decision under an arbitrary and capriciousness standard, giving appropriate consideration to the presumed conflict of interest existing from Defendant's contemporaneous relationship as plan administrator and payor.

**B.      REVIEW OF DEFENDANT'S DECISION**

Upon review of Defendant's decision, the Court finds that Defendant acted arbitrarily and capriciously by: (1) not following a stated, methodical appeal process and inconsistently applying and reverting between the STD plan and the LTD plan; (2) applying a standard of "total disability" that does not appear in either plan; and (3) failing to consider evidence of Plaintiff's exacerbated wrist condition.

**i.      Procedural concerns**

First, the Court notes that Defendants have not processed Plaintiff's claim consistently as an STD claim or as an LTD claim.  While the Court is concerned with whether Defendant's final decision was arbitrary and capricious, this case presents a confounded procedural history and it presents an  LTD Plan with a complete lack of procedural guidelines, making it difficult to discern

-8-

what exactly constitutes Defendant's final decision.  *See*, *e.g.*,  *Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 381 (6th Cir. 2009) ("ERISA requires that a plan fiduciary retain ultimate control, and ultimate responsibility for, *all final decisions*.") (emphasis added); *Bennett v. Kemper Nat. Services, Inc.*, 514 F.3d 547, 555-56,  (6th Cir. 2008) (" Our concerns with the file reviews in this case weigh significantly in favor of a finding that the *final decision* was arbitrary or capricious.")(emphasis added); *Houston v. Unum Life Ins. Co. of America*, 246 Fed.Appx. 293, 302-03 (6th Cir. 2007) ("Viewing these flaws in the context of the entire record, we conclude that Unum's *final decision* to terminate Houston's benefits was arbitrary and capricious: neither 'the result of a deliberate principled reasoning process', nor 'supported by substantial evidence.' ") (emphasis added).

Here, neither the Comprehensive Welfare Plan, the STD Plan, nor the LTD Plan outline a procedure for appealing a termination of benefits.  *See* Tr. at 1885-1934, 796-802, 1953-1958.   Yet, following Plaintiff's first appeal letter of February 12, 2007, (Tr. at 886-87), Defendant sent a letter on July 19, 2007 denying the appeal, stating that  "As she has completed the appeal process under the Plan, Ms. Burge has the right to bring a civil action in a court of law under Section 502(a) of [ERISA]."  Tr. at 881 (with Defendant defining "Plan" as Comprehensive Welfare Benefits Plan, *see id*.).  The Court sees no appeal process anywhere in the Comprehensive Welfare Benefits Plan. Plaintiff's initial termination notice mentions that a "Benefit Claim Procedure at Section 4.4," setting forth an appeal process, whereby an appeal will be answered within 45 days. Tr. at 885.  However, the Court does not see such a procedure in the Comprehensive Welfare Plan, and neither the STD Plan nor the LTD Plan has a Section 4.4.    Therefore, it is not clear that a procedure existed for considering even an initial appeal.  Moreover, following the representation that Plaintiff exhausted the appeal process, Defendant entertained further appeals from Plaintiff and articulated two other decision letters, one on September 12, 2007  (Tr. at 237-39), and one on February 18, 2009 (ECF Dkt. #23, Ex. 1).  Although these letters were solicited at Plaintiff's request, Defendant never clearly indicated that it was refusing to undertake further review and it issued reasoned decisions.

On Defendant's assertion, the July 19, 2007 letter would be the final decision for ERISA purposes because it advised Plaintiff that she could file a federal suit.  But, if the applicable plans do

not provide for an appeal process, perhaps the initial denial is the final decision.  Perhaps the subsequent discretionary reviews are final decisions.  In short, Defendant conducted reviews at its leisure and had in place  no stated or methodical appeal procedure under which Plaintiff could contest the termination of her benefits.  This determination is critical, because this Court must consider the evidence of record at the time of the final decision, and the medical records in this case continued to develop over time.  *See Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005) (holding that a court must review a plan administrator's decision  based upon the administrative record as it existed when the plan administrator made its final decision).

Further confounding the issue, the Court notes that the last decision to be issued is not necessarily the final decision for ERISA purposes.  By means of analogy, the Court points to social security law, where the Appeals Council may articulate a decision denying review of a claim, but that decision does not constitute the final decision of the Commissioner due to a statutory provision.  20 C.F.R. §§ 404.981, 404.972. Where, as here, the applicable disability plans provide no procedure for appeal (*see* Tr. at 1885-1935, 796-802, 1953-1958), and the plan administrator continues to entertain appeals at its discretion (*see* Tr. at 881-82, 237-39, ECF Dkt. #23, Ex.1), the Court cannot determine when a decision becomes final.  If it never becomes final and the plan administrator always retains discretion to change its disposition, then the "stage is set" for arbitrary and capricious decision-making.  This case provides a prime example of such arbitrary and capricious decision-making because Defendants specifically advised Plaintiff that she had exhausted her appeals and could file a suit in Federal Court, but then Defendant went on to entertain two more appeals.  As long as Defendant continues to entertain appeals, even through the pendency of this suit, there is no indication of finality in Defendant's decision.  Further, the Court questions the propriety of terminating Plaintiff's employment and arbitrarily closing the administrative record in August of 2006 while Defendant continued to entertain appeals of her disability claims, given that none of the applicable Plans outline a procedure for issuing a final disability determination.

Moreover, Defendant has considered Plaintiff's claim as an STD claim at times and as an LTD claim at other times.  Of course, this procedural wavering could affect the outcome of Plaintiff's claim since the terms of the STD claim and the LTD claim are different.  (most notably, the

-10-

definition of "disability").[2]   At the December 11, 2009, status conference/hearing on the matter,

Defendant asserted that Plaintiff never exceeded the term of the STD Plan because her benefits were

terminated after approximately five months.  In stark contrast to this assertion, the initial notice of

disability award that Defendant sent to Plaintiff stated as follows:

> **This letter is to advise you that you have now received approximately 12 weeks of Salary Continuance Payments for medical disability. . . .**
>
> Salary Continuance benefits will be paid to covered employees as follows:
>
> • **Short Term Disability:** 100% of Base Salary for the first three (3) months of an employees [sic] Disability, less any amount of offset by Social Security (see Appendix A), Railroad Retirement Act benefit, Workers' Compensation, or any similar benefit provided by lay or government agency.
>
> • **Long Term Disability:** 60% of Base Salary **following the first three (3) months** of an employees [sic] Disability, less any amount of offset by Social Security, Railroad Retirement Act benefit, Workers' Compensation, or any similar benefit provided by lay or government agency, **payable until the employee is no longer disabled, reaches age 65, or** attains the fifth (5th) anniversary from the commencement of Disability commenced after age 60.  As any offset amount changes/increases (annual review by Social Security, Etc.) the new amount will be used as the offset amount in calculating the benefit.

Tr. at 846 (first emphasis added, remainder original).   Therefore, it appears that Plaintiff was very

near the time of eligibility for LTD benefits on receipt of the March 13, 2006 letter.  Consistent with

this letter, an internal memorandum indicates that Plaintiff received LTD benefits totaling $4,125.96

between July 1, 2006 and August 15, 2006.  *Id.* at 1495.  Despite the foregoing clear statement that

Plaintiff would receive LTD Benefits after three months and Defendant's internal memorandum,

Defendant subsequently sent Plaintiff a letter asserting:

> The disability benefits provided to Ms. Burge between September 2005 and August 2006 were provided under the Republic Engineered Products LLC Short-Term Disability Program (for  Salaried Employees). . .
>
> *        *        *
>
> The STD Plan specifically states that the provisions of the Plain of the STD Document will control to the extend that any provision of any other document is inconsistent with or conflicts with the Plan or the STD Program document.  Thus, the provisions of the Salary Continuance Policy and Procedure, which are in some aspects inconsistent with

---

[2]        *Compare* Tr. 799 (§ 1.1(3)) *with* Tr. 1954 (§(4)).

the STD Document, are superseded.  However, **it should be noted that inconsistencies in the Salary Continuation Policy and Procedure were either labeling differences (e.g., calling months 4-12 Long Term Disability when, in fact, they were the 60% level of the STD Plan)** or were construed in Ms. Burge's favor (e.g., providing benefits to her, at least for the first several months, under a policy that was labeled as for Non-Work Related Disability).

Tr. at 882. (emphasis added).

The Court fails to see how Defendant can conclude that "calling months 4-12 Long Term Disability" was a matter of a labeling difference when the notice that it sent to Plaintiff states the terms of the LTD Plan *verbatim*.  *Compare* Tr. 846 *with* Tr. 1956.  Moreover, Defendant stipulated that "The Long Term Disability Plan (LTD) is found at R1953-1958." where the precise language implementing the LTD Plan after *three months* is located.  ECF Dkt. #35 at ¶1.  Further, although the STD Plan provides that benefits may be paid for up to 360 days, it provides that STD benefits "will terminate"  on the date that the "STD Program Participant has been determined to be eligible to receive benefits under the Employer's long-term disability program. . ."  Tr. at 801, 802, §§3.2, 3.4(7).  Since Defendant's initial notice of a disability award constituted notice that Plaintiff was eligible for LTD benefits after three months and since the LTD Plan provides that benefits may be paid at that time, Defendant's assertion of a "labeling difference" was unreasonable.  Plaintiff's claim should have been considered under the procedures, policies and definitions set forth in the LTD Plan.  Under the applicable provisions in this case, it was entirely unreasonable for Defendant to grant benefits, stating that she would receive LTD benefits after three months, and then terminate her claim as an STD claim after approximately five months.[3]

Further, the footnote in Defendant's July 19, 2007 letter (quoted above) is internally inconsistent.  It asserts that Plaintiff's claim is covered by the STD Plan, but then states that

---

[3]     It is not clear from the initial award letter when the effective date of the benefits was intended to be – *i.e.*, the date of the disability application (February 9, 2006) or the date of the letter (March 13, 2006).  However, the letter indicates that Plaintiff had already received 12 weeks of salary continuance payments for medical disability.  Tr. at 846.   Even giving Defendant the benefit of the doubt, and assuming benefits were paid only from the date of the letter, over three months elapsed between the time the letter was sent and the time Defendant terminated Plaintiff's benefits on September 11, 2009. (884-85).  Therefore, regardless of how the March 13, 2009 letter is construed, the LTD Plan was implicated by the time Plaintiff's benefits were terminated.

-12-

Defendant has provided benefits under a document titled Salary Continuance for Non-Work Related Disability.  Tr. at 882.  However, Defendant has specifically stipulated that the document titled Salary Continuance for Non-Work Related Disability is the *LTD Plan*.  ECF Dkt. #35.  The footnote is also inconsistent because Defendant now contends that it granted Plaintiff's claim for depression, which Defendant contends is a non-work related impairment.  Tr. at 237-39; ECF Dkt. #23, Ex. 1 (as to contention that disability claim was based upon wrist); ECF Dkt. #26 at 6 ("The non-work related reason was depression-not the wrist injury.").[4]  Yet, Defendant maintains that it construed the Plan in Plaintiff's favor by paying her under a non-work related disability plan.  Tr. at 882.  If Defendant paid benefits on the basis of depression, a non-work related impairment, then it could not be "construing" the Plan in Plaintiff's favor by paying her under a non-work related disability plan.  Rather, Defendant was simply applying the appropriate non-work related disability plan. Throughout the appeal, Defendant simply continued to waver in its position on as to what the applicable plan is in this case.

In sum, Defendant's assertion in the July 19, 2007 letter that it was construing the Plan in Plaintiff's favor by paying benefits under a non-work related injury salary continuance plan is inconsistent with Defendant's assertion that it granted benefits to Plaintiff on the basis of depression, which is a non-work related injury.  On the other hand, if Defendant did receive disability benefits for the impairment on the initial application – her work-related wrist impairment– then Defendant has for some unexplained reason applied an LTD Plan titled "Non-Work Related Disability" to pay benefits (while asserting that she never exhausted the STD term).  Given the inconsistencies in Defendant's statements, it simply cannot be said that Defendant employed a deliberate principled reasoning process, supported by substantial evidence.

### ii.    Incorrect application of "total disability" standard

Next, the Court finds that Defendant acted arbitrarily and capriciously by requiring Plaintiff to establish that she was "totally disabled."  As previously stated, the LTD Plan applies to the instant

---

[4]     *See* subsection iii., below for a more detailed discussion of the procedural history pertaining to Defendant's assertion of the basis of Plaintiff's disability claim.

case.  The LTD Plan defines a "Disability"as follows:

> A "Disability" ("Serious Health Condition" under FMLA) is defined as an illness, injury, impairment or physical or mental condition that involves inpatient care or continuing treatment by a healthcare provider.

Tr. at 1954. As discussed more fully below, this definition does not require total disability.

In terminating Plaintiff's benefits, Defendant stated "The Plan requires that you be totally disabled in order to receive benefits."  Tr. at 884. In addition to explicitly stating that "the Plan" (referring to the Comprehensive Welfare Benefits Plan) requires a showing of total disability, Defendant also relied upon an opinion of Dr. Martin stating that Plaintiff was not totally disabled. *Id*.  To the extent that Defendant required Plaintiff to establish total disability, Defendant acted arbitrarily and capriciously by rewriting the LTD Plan instead of interpreting the Plan, which does not require that Plaintiff be totally disabled. *See University Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 849 (6th Cir. 2000).  Defendant did not even clearly identify  which disability plan's definition of disability it was applying (*i.e.*, STD or LTD).  Neither one of those plans explicitly define the term "total disability," and Defendant's letter did not provide a definition either. *Id*.  In contrast, *see Osborne v. Hartford Life and Acc. Ins. Co.,* 465 F.3d 296, 297, (6th Cir. 2006), where the plan administrator defined the term "Totally Disabled": "Section I of the policy defines '**Totally Disabled**' to mean that ' you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis.' ") (emphasis added).  *See also Donnelly v. Guarantee Mut. Life Co.*, 181 F.3d 100 (Table), 1999 WL 313896 at *1 (6th  Cir. May 4, 1999), unreported (after citing the plan's definition of "total disability" the court held "In light of these definitions, if an employee can perform even one of his main employment duties despite his illness, then he does not qualify for total disability benefits under the plan."); *Tolley v. Commercial Life Ins. Co.*, 14 F.3d 602 (Table), 1993 WL 524284 at *1 (6th Cir. Dec. 17, 1993.), unreported (quoting the plan's definition of  total disability: "totally disabled (unable to engage in each and every occupation or employment for compensation or profit for which you are reasonably qualified by reason of your education, training or experience")").  In the case at bar, Defendant required a showing of total disability, even though the term "total disability" is mentioned, much less defined, nowhere in the STD or the LTD Plans.

Subsequently, in the July 19, 2007 appeal letter, Defendant relied on a different definition, contending that "a 'disability' is defined as a condition that prevents that a participant from engaging in his or her regular occupation, for which the participant is under the regular care and personal attendance of a medical doctor or other professional practitioner for treatment aimed at maximizing such participant's recovery and return to work." Tr. at 881.  In the September 12, 2007 and February 18, 2009 reconsideration letters, Defendant did not specifically articulate the definition of disability that it was applying.  *See* Tr. at 237-39, ECF Dkt. #23, Ex. 1.  However, those letters both relied on an opinion from Dr. Reichert that Plaintiff was not "totally disabled." Tr. at 237; ECF Dkt. #23, Ex. 1.  In reviewing this matter, the Court will address the LTD Plan, having previously found that it is the appropriate plan for considering Plaintiff's appeal.  The LTD Plan, quoted above, neither explicitly requires total disability, nor does it set forth the standard that Defendant articulated in its July 19, 2007 letter.[5]  One could argue that the language stating that benefits will be granted to "employees who are unable to work due to a non-work related disability," could be construed as imposing a total disability standard because it requires an inability to engage in work.  An inability to work could mean an inability to perform *any* work.  However, Defendant's decision still fails to survive an arbitrary and capricious standard of review because there is no clear indication that Defendant ever even considered this contractual language – or even considered the terms of the LTD Plan at all.  *See* Tr. at 884-85 (stating that the Comprehensive Welfare Benefits Plan requires a showing of total disability); 882 (maintaining that the denial of Plaintiff's claim was made under the STD Plan).  The Court is left without any direction as to where Defendant derived a "total disability"

---

[5]     Of note, the STD Plan also does not require "total disability":

> **Disability:**  A Condition (i) that prevents an STD Program Participant from engaging in his regular occupation, (ii) for which the STD Program Participant is under the regular care and personal attendance of a Physician for treatment aimed at maximizing such STD Program Participant's recovery and return to work, (iii) during which the STD Program Participation does not engage in any occupation or perform any work for compensation or profit, except in any planned vocational rehabilitation training program approved by the Plan Administrator for such STD Program Participant prior to his participation in such program, and (iv) for which the Elimination Period has completed.

Tr. at 799.

-15-

standard.  Defendant's unsupported use of the term "totally disabled" is detrimental to its analysis because the term can be defined in many different ways.  *Compare, Osborne*, 465 F.3d at 297 (inability to perform "your own occupation" on a full time basis); *Donnelly*, 1999 WL 313896 at *1 (inability to perform even one main employment duty); *Tolley*, 1993 WL 524284 at *1(unable to engage in each and every occupation or employment for compensation or profit ).  What remains constant is the fact that there is no indication that Defendant ever considered the interpretation of the clause "employees who are unable to work due to a non-work related disability,"with "work" meaning any and all forms of employment.  Therefore, the Court cannot, on this basis, conclude that Defendant has undertaken a deliberate principled reasoning process in requiring a showing of total disability.  Moreover, because "total disability" is not a defined term in the disability plans and because Defendant never defined the terms in its letters, Defendant never provided Plaintiff with meaningful notice of the standard by which her disability claim was being judged.

The LTD Plan also incorporates the definition of a Serious Health Condition under the FMLA, but it appears that the term "Serious Health Condition" is much less restrictive than how Defendant has defined it in its decision letters.  Under the FMLA one need not show total disability in order be considered disabled.  The FMLA defines a Serious Health Condition as:

> (11) Serious health condition
>
> The term "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves--
>
>> (A) inpatient care in a hospital, hospice, or residential medical care facility; or
>>
>> (B) continuing treatment by a health care provider.

29 USC. § 2611(11).  Under the FMLA, a person is entitled to 12 workweeks of leave during a 12-month period if a serious health condition that makes the employee unable to perform the functions of the position of such employee. 29 U.S.C.A. § 2612(a)(1)(D).  As the First Circuit Court of Appeals noted:

> The [district] court apparently read the statute to require Hodgens to be actually incapacitated, in the sense of medically too sick to work, for any absence that was to be protected by the FMLA.
>
> We disagree. The statutory language-"unable to perform" his job-in 29 U.S.C. §

-16-

2612(a)(1)(D) does not necessarily mean that an employee's physical condition itself "actually incapacitate[s]" him and prevents him from working.

*Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 163-64 (1st Cir. 1998).

In the September 12, 2007, Defendant principally relied on the opinion of Dr. Reichert, quoting "**I do not believe at this time that Ms. Burge is totally disabled** for either the allowable conditions or the requested additional conditions in this claim." Tr. at 237 (emphasis added).  To the Court's knowledge, Dr. Reichert is not a vocational expert capable of advancing opinions in the field of disability; the extent of his training is medical science and impairment-induced limitations.  *See Willis v. Baxter Intern., Inc.*, 175 F.Supp.2d 819, 832 (W.D.N.C. 2001) ("Absent a showing of vocational expertise, courts, as well as disability adjudicators, give little deference to the opinions of medical doctors on the ultimate determination of 'disability.' ").    The ultimate issue of disability is an inquiry as to the ability the person has to perform *vocational duties* in light of impairment-induced limitations.  *See  Congrove v. St. Louis-San Francisco Ry. Co.*, 1980 WL 2092 (Oct. 28, 1980), unreported (in a case involving the reemployment rights of a veteran returning from military service who sought reinstatement as a switchman, the court noted: "The factual issues in this case present mixed questions of medical and vocational expertise.").  The Court is unaware of any basis by which Dr. Reichert is trained to advance such an opinion pertaining to vocational duties.  Even if Dr. Reichert were trained in the field of vocational studies, he applied the incorrect standard of total disability, which does not appear in either the LTD or the STD plan.  Therefore, Defendant's reliance on his opinion was unreasonable.

On February 18, 2009, Defendant reasserted its reliance on Dr. Reichert's opinion.  ECF Dkt. #23, Ex. 1 at 2.  Notably, both times Defendant quoted Dr. Reichert's opinion, Defendant omitted (without use of ellipses) the sentence "She should also avoid repetitive use of the right hand and wrist."  *Compare* Tr. at 237; ECF Dkt. #23, Ex. 1 at 2 *with* Tr. at 1863.  While this statement may be of little consequence under a total disability standard, it does make a difference under the definition stated in the LTD Plan.  It was only under the non-repetitive use restriction that Dr. Reichert opined that Plaintiff could return to work.  While the Court is not approving Dr. Reichert's venture into opinions on vocational matters, the Court notes that his opinion may very well have been

-17-

different had he applied the definition of disability articulated in the LTD Plan.  This potential difference demonstrates the downfall with Defendant's reliance on his opinion of disability.  Because Defendant misquoted Dr. Reichert's opinion, there is no indication that Defendant independently considered Dr. Reichert's suggested restrictions from a vocational perspective.  Accordingly, the Court cannot conclude that Defendant employed a deliberate principled reasoning process, supported by substantial evidence.

Lastly, the Court reiterates that uncertainty exists regarding which decision constitutes Defendant's final decision.  If it is the letter of September 12, 2007 or the letter, February 18, 2009, the Court notes that Defendant failed to articulate the definition of disability that it applied – aside from relying on Dr. Reichert's opinion that Plaintiff was not "totally disabled."  Therefore, uncertainty exists as to which definition of "disability" Defendant applied in considering Plaintiff's claim appeals.  In conclusion, it is not possible to conclude that Defendant's decision is the result of a deliberate principled reasoning process, supported by substantial evidence.

### iii.  Failure to consider evidence of Plaintiff's exacerbated wrist

Lastly, confusion existed regarding the basis of Plaintiff's appeal – was it premised upon her wrist injury or upon a psychological impairment?  This confusion appears to have arisen as a result of Defendant's arbitrary interpretation of Plaintiff's claim.  Although the initial disability application indicates that she applied for benefits based upon injuries resulting from a work related incident[6] and although Defendant's notice of an award of disability benefits does not state a factual basis for the claim, Defendant unilaterally contended in its September 12, 2007 letter that Plaintiff received disability for severe depression from February, 2006 through August 15, 2006.  Tr. at 686, 846, 237, respectively.  If the disability was ultimately awarded on the basis of depression, the Court fails to see in the record where a supplemental application was made seeking benefits due to depression.  Apparently, at some point between filing her application for disability benefits and receiving an award of benefits, Plaintiff was permitted to change the basis of her claim from a physical injury to

---

[6]     Of note, Plaintiff listed Dr. Cash of the Summit Hand Center as her treating physician, so she must have been referring, at least in part to her wrist injury.

a psychological impairment.  Curiously, throughout the course of appeals, Defendant insisted that evidence of Plaintiff's physical impairments was irrelevant because she was granted benefits on the basis of a mental impairment.  Tr. at 237-39, ECF Dkt. #23, Ex. 1.  Yet, Defendant never considered the fact that the original basis for her disability claim was the wrist injury.  Since Defendant's Plan does not articulate a procedure for closing the administrative record, the Court finds it was arbitrary and capricious to change the basis of Plaintiff's claim and then to refuse to consider further evidence pertaining to Plaintiff's wrist after August of 2006.  To summarize, Defendant failed to articulate an appeal process, accepted appeals at its leisure, never notified Plaintiff of the factual basis of her disability award, changed the factual basis of Plaintiff's disability claim, and then refused to accept evidence pertaining to the injury listed on the initial disability application on the reasoning that her benefits were initially granted for a psychological impairment.

Of note, a factual basis exists for concluding that Plaintiff is disabled based upon her wrist impairment.  Plaintiff was ultimately granted Social Security benefits for her wrist impairment.  The SSA considered evidence pertaining to Plaintiff's wrist surgery and therapy, which Defendant did not consider.  *See* Tr. at 238-39.  Notably, Dr. Seitz performed surgery on Plaintiff's wrist on January 8, 2007.  Tr. at 658.  Plaintiff continued to treat with Dr. Seitz for her wrist impairment through April of 2007.  *Id*. at 252, 254, 256, 262, 264, 266, 269, 272, 283-85, 287, 658-59.    As of April, 2007, Dr. Seitz's diagnosis remained chronic distal radioulnar joint arthritis, distal radioulnar joint diasociation, and triangular figbrocartilage complex rupture.  *Id*. at 252.  On May 10, 2007, Dr. Magoline opined that Plaintiff has not reached maximum medical improvement.  *Id*. at 377.  She was currently undergoing occupational therapy and participating in a home exercise program.  *Id*.  Dr. Magoline did not expect Plaintiff to reach maximum medical improvement until 12-16 months post-operatively.  *Id*.  Dr. Magoline opined that Plaintiff would require the following restrictions in the work-setting minimal use of the right hand; no repetitive use of the right hand; no lifting greater than 5 lbs with the right hand.  *Id*.  These treatment notes provide a basis for concluding that Plaintiff was disabled under the LTD Plan, *i.e.* she suffered an illness, injury, impairment or physical or mental condition that involves inpatient care or continuing treatment by a healthcare provider.  In fact, Dr. Reichert opined that surgical intervention could confirm or eliminate a TFCC tear and "surgical

-19-

exploration is appropriate for Ms. Burge. . .". Tr. at 1863.  Dr. Reichert said nothing of the recovery and therapy time that would follow surgery, as has been detailed by Dr. Seitz and Dr. Magoline, *Id*. And he temporally limited his opinion of disability, upon which Defendant relied "I do not believe **at this time** that Ms. Burge is totally disabled. . ."  *Id*.  Therefore, the treating physicians' notes provide the only source of information as to whether Plaintiff was capable of working during the post-operative period, and they support a finding of disability, as discussed above.   However, Defendant wholly refused to consider the records without any procedural support for closing the administrative record.  Accordingly, its decision was arbitrary and capricious.

### C.    COUNTS II AND III

In Counts II and III, Plaintiff seeks a determination that she is vested in her 401(k) Plan by virtue of disability.  ECF Dkt. #1 at 5.  While it appears that neither party has directed the Court to the 401(k) Plan, the Court notes that Defendant issued a letter on February 18, 2009 stating that the 401(k) plan provides that a participant becomes 100% vested in her Profit-Sharing Sub-Account if she is employed at the time she becomes Disabled, with disability being defined as follows:

> **"Disabled"** means a Participant can no longer continue in the service of his employer because of a mental or physical condition that is likely to result in death or is expected to continue for a period of at least six months.  A Participant shall be considered Disabled only if the Administrator determines that he is Disabled based on a written certificate of a physician acceptable to it.

ECF Dkt. #23, Ex. 2.  It appears to be undisputed that Plaintiff meets the time requirement, as she filed a disability claim on February 9, 2006, and Defendant paid benefits through September 11, 2006.  Tr. at 686, 884-85.  Although the initial award letter was sent on March 13, 2006, there was no indication that Defendant found Plaintiff's onset date to be anything other than February 9, 2006, as indicated in the initial application.  *See* Tr. at 846.  In fact,  the letter of March 13, 2006 states that "you have now received approximately 12 weeks of Salary Continuance Payments for medical disability."  *Id*.  This letter establishes that Plaintiff was considered to be disabled for 12 weeks (approximately 3 months) prior to March, 2006.  Further, it is undisputed that Plaintiff received disability benefits from at least March, 2006 through August, 2006.  Therefore, Defendant clearly found satisfactory evidence under the STD and LTD Plans to find Plaintiff disabled for a six month period.

This determination was apparently reached in applying a stringent "total disability" standard. *See* Tr. at 884-85, 237-39, ECF Dkt. #23, Ex. 1.  While neither the STD Plan nor the LTD Plan required a showing of total disability, the important observation is that Defendant was satisfied that the medical records demonstrated that Plaintiff was totally disabled.  Therefore, Defendant's determination that Plaintiff was not "disabled" under the definition in the 401(k) Plan was arbitrary and capricious because if she had been considered totally disabled until then she clearly could not continue in the service of her employer as the 401(k) Plan inquires.  Based upon Defendant's objective manifestations, it is clear that Plaintiff satisfied the six month requirement and it is clear that Defendant found the written certificates from physicians to be acceptable to document that she was totally disabled for that time.  Accordingly, Defendant's determination that Plaintiff was not disabled was arbitrary and capricious.

The Court further notes that the 401(k) Plan's requirement of obtaining a certificate of a physician acceptable to Defendant is vague and leaves Defendant with unfettered discretion to deny claims.  It is unclear whether the phrase "acceptable to it" modifies "physician" or "certificate."[7] However, Defendant has simply asserted that evidence generated after August, 2006 is irrelevant. Again, the Court questions the propriety of arbitrarily closing the administrative record and terminating Plaintiff's employment during an open disability appeal without a supporting administrative procedural basis for doing so.  Accordingly, the Court finds that the requirement of obtaining a certificate acceptable to Defendant, without any predefined considerations, affords Defendant unfettered discretion to deny any claim it wishes. In and of itself, this scenario is not contrary to any contractual principles of which the Court is aware.  Rather, it is the result of a bargained-for contractual term.  However, this term places Defendant in a situation prone for arbitrary and capricious decision-making.

---

[7]     It is unclear whether the Court can construe this ambiguity against Defendant based upon the dueling considerations of an "arbitrary and capricious" standard and the doctrine of *contra proferentum. See e.g.,  University Hospitals*, 202 F.3d at 846-47 (noting that *contra proferentum* is a consideration under an arbitrary and capricious standard); *Smiljanich v. General Motors Corp.*, 182 Fed.Appx. 480, 486, n. 2 (May 25, 2006), unreported (questioning *Univeristy Hospitals*); *Mitchell v. Dialysis Clinic, Inc.*, 18 Fed.Appx. 349, 354 (6th Cir. , 2001), unreported (questioning *Univeristy Hospitals*).

Here, Defendant has offered no reasonable explanation for rejecting medical records after August, 2006. Defendant contends that medical records generated following August, 2006 are not relevant because they were created in the post-termination period. The Court first notes that Plaintiff suffered the wrist injury inducing the disability while she was employed, and the Court sees nothing in the definition of disability regarding onset of the physical condition causing the impairment. Further, Plaintiff's employment was terminated during pending disability appeals. The manner in which Defendant has interpreted its 401(k) Plan permitting termination of employment between a workplace injury and the final disability determination is dubious. Such an interpretation would permit Defendant to immediately terminate employees following certain workplace injuries, prior to the onset of debilitating symptoms, in order to avoid contractual liabilities. Therefore, this interpretation is arbitrary and capricious. In this case, Defendant was aware that Plaintiff was under the continuous care of medical physicians and Defendant held Plaintiff's disability appeals open. Yet, Defendant terminated her employment and closed the administrative record prior to learning the final prognosis of her medical condition. This action was unreasonable.

As discussed above, the medical evidence of Plaintiff's condition deteriorated following 2006, as documented by records from Dr. Seitz and Dr. Magoline, detailed above. However, Defendant refused to consider these records in determining if Plaintiff was disabled for the purposes of 401(k) vesting. Instead, Defendant relied on an opinion from Dr. Reichert from what it deemed to be the relevant period, where again, Dr. Reichert opined that Plaintiff was not "totally disabled." *See* ECF Dkt. #23, Ex. 2. However, the 401(k) plan does not require total disability, but an inability to continue in the service of the employer.

Since Plaintiff meets the definition of disability under the 401(k) Plan and since Defendant failed to consider evidence of her medical impairment, she is entitled to vesting under the Plan.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment (ECF Dkt. #25) is GRANTED and Defendant's motion for summary judgment is DENIED (ECF Dkt. #24). Judgment is entered in favor of Plaintiff on Counts I, II, and III.

IT IS SO ORDERED.


DATE: January 6, 2010                                    */s/  George J. Limbert*
                                                        GEORGE J. LIMBERT
                                                        U.S. MAGISTRATE JUDGE